IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| SAMANTHA HOWARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 2:21-cv-04034-MDH |
| | ) |
| CITY OF SEDALIA, MISSOURI, | ) |
| D/B/A BOTHWELL REGIONAL | ) |
| HEALTH CENTER, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Before the Court is Defendant's Motion for Summary Judgment. (Doc. 59).[1] The motion has been fully briefed and is ripe for review. For the reasons set forth herein the Court denies Defendant's motion.

## BACKGROUND

Plaintiff, a pharmacist, has brought this lawsuit against her former employer, the City of Sedalia, Missouri, d/b/a Bothwell Regional Health Center, alleging disability discrimination – failure to accommodate. In her single count Complaint Plaintiff alleges she was employed by Defendant as a pharmacist and requested permission for a diabetic service dog to accompany her to work. Plaintiff alleges Defendant failed to engage in an interactive process in good faith to accommodate her disability and that she was compelled to resign her position in violation of her ADA rights. The facts of the case as presented in the parties' briefing are largely uncontested.

---

[1] Defendant also filed a Motion to Amend Exhibit to Doc. 60 - replacing Exhibit 4 of its suggestions in support of summary judgment filed on February 4, 2022. Plaintiff did not object to this motion. The Court grants Defendant's motion to replace Exhibit 4 to its summary judgment brief. (Doc. 61).

1

Plaintiff was diagnosed with Type 1 diabetes at or around 14 months old. Plaintiff was also diagnosed with hypoglycemic unawareness during pharmacy school between 2014 and 2018. Hypoglycemic unawareness is a condition where a person does not recognize their blood sugar levels have dropped to a dangerously low level. On or about June 5, 2017, Plaintiff requested a service animal to assist with management of her diabetes and hypoglycemic unawareness from CARES, Inc. a company that trains and sells service dogs. CARES, Inc. put Plaintiff on a waiting list. Plaintiff was told it could be about two years before she received an animal.

Plaintiff began working as a pharmacist at Bothwell on or around March 15, 2019. Plaintiff informed her supervisor, Pharmacy Director Brad Nicholson, that she had diabetes and he granted her request for an informal accommodation to have food and drink at her desk while she was working alone. Plaintiff did not inform Bothwell at that time about her pending request for a service animal.

Within the Bothwell pharmacy, there are several distinct areas. Two of these areas are the anteroom and the clean room. The clean room is a sterile area, requiring Personal Protective Equipment ("PPE") to enter. IVs are prepared in this area. As part of Plaintiff's job she was required to enter the clean room. The anteroom is located between the main pharmacy and the clean room and is an area where employees prepare to go into the clean room, including washing hands, putting on PPE, etc. Unlike the "sterile" clean room, the main pharmacy outside the anteroom and clean room is considered a "sanitary" area. Non-sterile drug compounding and preparation is performed in the main pharmacy.[2] Occasionally Plaintiff would put drugs together in the main pharmacy area.

---

[2] USP Section 795 is the governing standard applicable to compounding that is performed in the Defendant's pharmacy, outside of the pharmacy anti-room and clean room (referred together herein as the Defendant's "sterile compounding suite").

2

Pharmacy personnel are not required to wash their hands when entering or exiting the pharmacy and are not required to wear gloves, hair covering, gowns or other PPE when working in the pharmacy outside of the sterile compounding suite. The pharmacy personnel do "very little" compounding outside of the sterile compounding suite. The pharmacists' workstations are in the room where non-sterile compounding takes place. Compounding is not done at their workstations.

Plaintiff states she only went into the clean room portion of the sterile compounding suite about once a week to make an IV. Bothwell estimates that a pharmacist would need to be inside the clean room anywhere from 5-20 times per shift, especially if the pharmacist is working the late shift when only one pharmacist is on duty. Plaintiff states once a shift she would go into the ante room to verify IVs prepared by technicians and that she was not required to pass the line of demarcation to verify the IV. Plaintiff also states one or two times per shift she would enter the ante room to get IVs from the refrigerator. Bothwell states a pharmacist would cross the line of demarcation to get IVs from the refrigerator.

In early June 2020, Plaintiff received a notice from CARES, Inc. that a service dog had become available for her to pick up in August. On or about June 8, 2020, Plaintiff informed Bothwell that she would be requiring a service animal by speaking with Lisa Irwin, Bothwell's Executive Director of Human Resources & Support Services. Bothwell had never previously encountered a request to have a service animal in its pharmacy. Irwin provided Plaintiff a Request for Accommodation Packet so that Bothwell could gather additional information to assist in making a decision regarding the service animal. At this time, Plaintiff believed she would need the service dog at her side constantly for six months for training purposes, and then after that she could go to work without her. Plaintiff requested that her service dog be allowed in the main pharmacy, a sanitary area, but did not ask to bring her into the pharmacy's anteroom or clean room. Irwin

3

requested, and Plaintiff provided, an authorization that permitted Bothwell to speak directly to the physicians treating Plaintiff's diabetes.

On or about June 12, 2020, Defendant received a letter regarding Plaintiff's need for a service animal from Plaintiff's physicians, which included an invitation to Defendant to reach out to the physician if there were any questions. Irwin did not contact the physician's office, nor did she direct anyone to do so.

In late June 2020, Plaintiff told Irwin that she did not believe she had to fill out the Request for Accommodation Packet to move forward with her request. Nevertheless, Plaintiff filled out the Accommodation Packet and left it in Irwin's office on July 13, 2020. On or about July 24, 2020, Irwin wrote a letter to Plaintiff summarizing the status of the interactive process to that point and requested that Plaintiff have her doctor fill out an additional ADA Health Provider Questionnaire. Plaintiff provided the ADA Health Provider Questionnaire to Defendant on or about July 28, 2020.

After Plaintiff provided her completed paperwork, Irwin set up a team to investigate and review Plaintiff's request. She asked Nicholson, Jennifer Unkel (Bothwell's Risk/Regulatory/Compliance Manager), Kathy Trogden (Bothwell's Interim Infection Preventionist), and Dr. Phillip Fracica (Bothwell's Chief Medical Officer) to analyze the request and provide their opinions. Nicholson, Unkel, and Trogden were each asked to write a recommendation for whether the service animal should be in the pharmacy based on their individual investigations and respective specialties. Nicholson, Unkel, Trogden, Fracica, and Irwin performed a walkthrough of the Bothwell Pharmacy, including viewing the anteroom and clean room. Following the walkthrough, Nicholson, Unkel, and Trogden finalized their recommendation letters regarding Howard's service request. All three independently determined that having a

service dog in the pharmacy was a risk to the safety of Bothwell's patients and should not be allowed.

Unkel reviewed the Americans with Disabilities Act ("ADA") and the Conditions of Participation for the Centers for Medicare and Medicaid ("CMS") and focused on the CMS guidance that sterile or non-sterile compounded medications may be subject to contamination. She concluded: "In the event a service animal is approved to accompany a staff member throughout the pharmacy, the organization cannot say with certainty that all of the Conditions for Participation are met as canines shed hair and carry dirt/debris under their paws." She said that allowing the animal in the pharmacy would risk Bothwell's accreditation, and that it would affect a patient if the medication was contaminated.

Nicholson reviewed a variety of sources and found that while none of them definitively stated that a service animal should not be in the inpatient pharmacy areas, the overall direction from these sources led him to the conclusion that service animals should be excluded from the area to allow for the highest quality patient care. Nicholson reviewed CDC guidance entitled "Background H. Animals in Health-Care Facilities" in connection with evaluating Plaintiff's accommodation request, reading the document in full. In his report to Defendant, Nicholson stated the following with respect to the CDC guidance:

> CDC guidance in regards to animals in health care settings acknowledges that animals can be reservoirs for antibiotic resistant bacteria, can increase allergens with saliva, dander, hair shedding and urine/feces. While the CDC supports the use of service animals in general public areas, it is appropriate to exclude them from special care areas which include medication preparation/storage, or areas where strict attention to hand hygiene must be maintained.

Within the CDC guidance that Nicholson reviewed, the CDC provided the following information specific to service animals:

5

> An overview of the subject of service animals and their presence in health-care facilities has been published. No evidence suggests that animals pose a more significant risk of transmitting infection than people; therefore, service animals should not be excluded from such areas, unless an individual patient's situation or a particular animal poses greater risk that cannot be mitigated through reasonable measures. If health-care personnel, visitors, and patients are permitted to enter care areas (e.g., inpatient rooms, some ICUs, and public areas) without taking additional precautions to prevent transmission of infectious agents (e.g., donning gloves, gowns, or masks), a clean, healthy, well-behaved service animal should be allowed access with its handler. Similarly, if immunocompromised patients are able to receive visitors without using protective garments or equipment, an exclusion of service animals from this area would not be justified.

Nicholson did not provide the information contained in the preceding paragraph to Defendant's team evaluating Plaintiff's request for accommodation.

The CDC's Guidance provides the following with respect to service animals:

> Because health-care facilities are covered by the ADA or the Rehabilitation Act, a person with a disability may be accompanied by a service animal within the facility unless the animal's presence or behavior creates a fundamental alteration in the nature of a facility's services in a particular area or a direct threat to other persons in a particular area. A "direct threat" is defined as a significant risk to the health or safety of others that cannot be mitigated or eliminated by modifying policies, practices, or procedures. The determination that a service animal poses a direct threat in any particular healthcare setting must be based on an individualized assessment of the service animal, the patient, and the health-care situation. When evaluating risk in such situations, healthcare personnel should consider the nature of the risk (including duration and severity); the probability that injury will occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk (J. Wodatch, U.S. Department of Justice, 2000). The person with a disability should contribute to the risk-assessment process as part of a pre-procedure health-care provider/patient conference.

> Excluding a service animal from an OR similar special care areas (e.g., burn units, some ICUs, PE units, and any other area containing equipment critical for life support) is appropriate if these areas are considered to have "restricted access" with regards to the general public. General infection-control measures that dictate such limited access include the area is required to meet environmental criteria to minimize the risk of disease transmission, strict attention to hand hygiene and absence of dermatologic conditions, and barrier protective measures [e.g., using gloves, wearing gowns and masks] are indicated for persons in the affected space.

6

Nicholson also relied on the Missouri Board of Pharmacy Regulations (Chapter 2, Division 2220 of the Missouri Code of State Regulations (CSR)) in evaluating Plaintiff's request for accommodation, quoting specifically from 20 CSR 222-2.2(7)(A) in his report. The regulations define "controlled area" in this context as "a separate room designated for preparing sterile preparations or an area designated for preparing sterile preparations that is separated from other actives/operations by a line of demarcation that clearly separates the area from other operations." While Nicholson included this provision of the regulations in his report, he failed to include the provision of the same chapter which states: "Animals, except for service animals as defined by the American with Disabilities Act (ADA), are not allowed in pharmacies." After relying on the CSR in his initial report, Nicholson took the position that the "CSR refers more to retail pharmacies and not to secure hospitals, and not secured areas that are storing and compounding sterile drugs."

Prior to issuing its initial denial of the Plaintiff's request for accommodation, Nicholson reached out to other pharmacists, but those pharmacists had not dealt with a similar request for accommodation. Nicholson did not reach out to the Department of Health and Senior Services or the Board of Pharmacy prior to issuing its first denial of the Plaintiff's request for accommodation.

Kathy Trogden is certified in infection control and epidemiology and has been working in infection control since 2008. Trodgen reviewed the CDC's Environmental Guidelines for Infection Control which stated that the presence of an animal could compromise a sterile environment. Her report listed certain areas where a service animal should not be allowed due to heightened risk, including medication storage/preparation areas. From an infection prevention standpoint, she found a "concern over the presence of a service animal within the pharmacy proper" due to contamination concerns. Trogden understood that she was asked to "provide a letter regarding guidelines, recommendations for service animals within a health care facility." Defendant never

7

Case 2:21-cv-04034-MDH    Document 77    Filed 04/21/22    Page 7 of 19

advised Trogden of the existence or requirements of the differing USP standards applicable to sterile and non-sterile compounding. Trogden never analyzed the extent to which it would create an infection control risk to have a service animal in the hospital pharmacy if the service animal did not enter the sterile compounding suite. Trogden needed to perform a full risk assessment to analyze the extent to which housing the service animal in the pharmacy but outside the sterile compounding suite would create an infection control risk. Had Trogden been permitted to complete a full risk assessment as offered, she would have evaluated the risk of disease transmission and contamination in the pharmacy in light of the proposed accommodation to house the service animal in an area of the pharmacy outside the sterile compounding suite. Trogden did not provide any analysis specific to the Plaintiff's requested accommodation. Trogden analyzed the CDC guidance that Nicholson analyzed. Like Nicholson, Trogden did not include any information from the CDC guidance specific to the risk posed by service animals in her report.

According to Trogden, she did not include this information based on her understanding that she was evaluating the pharmacy as a whole, rather than considering that the service animal would remain at Plaintiff's workstation when she was required to enter the employee pharmacy. At the time Trogden conducted her investigation Bothwell was operating with the understanding that Plaintiff needed the service animal by her side at all times for the first six months after Plaintiff obtained the animal. Howard did not realize that she could be away from the service animal for only limited periods of time until after she started training, which began in the first week of August.

In the first week of August, 2020, Bothwell provided Plaintiff with paid time off so that she could pick up and attend special training with her service dog. On or about August 6, 2020, Irwin sent a letter, via email, to Plaintiff stating Bothwell had denied her specific accommodation request to allow the service animal inside the pharmacy due to concerns about contamination. The

8

Case 2:21-cv-04034-MDH   Document 77   Filed 04/21/22   Page 8 of 19

letter stated, in part, we "consider[ed] the option [Plaintiff] raised of only allowing the service dog in certain areas of the pharmacy but we determined that such an action would not resolve the potential risks of contamination discussed above." The letter stated that Bothwell wanted to work with her to find a different accommodation.

Plaintiff responded via a letter from her counsel, Jennifer Johnson, who informed Defendant that it had made a mistake in denying Plaintiff's request. Counsel for Defendant, Elizabeth Wente, responded to Johnson and told her that Defendant would continue to provide paid leave for the rest of the week while the parties discussed other reasonable accommodations.

In an effort to gather additional information about Plaintiff's request, on August 13, 2020, Nicholson reached out to Tom Glenski, Chief Inspector of the Missouri Board of Pharmacy, regarding Plaintiff's request for a service dog in the pharmacy. After confirming the involved animal was a service animal rather than a support animal, Glenski responded to Nicholson:

> In general, the Board would prohibit an animal in the area where sterile or non-sterile compounding is being performed. However, the Board would need to review each case involving a service animal individually in order to make a determination. For any animal to be allowed in the pharmacy, it must meet the [ADA] definition for service animal.

An email from Glenski further stated:

> From my perspective and the BOP, the service dogs would be allowed in the Pharmacy public areas to p/u prescriptions, but would not be allowed where the other activities would occur, which not only includes sterile compounding but non-sterile compounding which we do in more than one area int eh Pharmacy. I will contact DHSS also.

Nicholson also reached out to Richard Grindstaff, Bureau Chief of Hospital Standards for the Department of Health and Senior Services ("DHSS"), which regulates hospital pharmacies in Missouri, to discuss the situation. Nicholson testified that when they spoke on the phone

9

Grindstaff told Nicholson that DHSS would issue a citation to Bothwell if it saw a dog in the pharmacy. In an email, Grindstaff stated:

> Brad, this is to follow up with our phone conversation today. If a member of the BHS team would observe a service dog within the pharmacy where sterile compounding for patient use is being performed, we would consider that a Infection Control issue and would give appropriate citations for putting your patients at risk for contamination of compounding material in your pharmacy. In any area that needs to have sterile protection in the hospital for patient protection, such as sterile processing, surgery, and any other area that needs to maintain sterility, the hospital is responsible to comply with national standards and regulations for this area. Any other questions, please let me know.

> On August 19, 2020, Irwin inquired with Nicholson to provide further clarification.

Nicholson responded to Irwin's August 19, 2020 email with two separate emails, stating:

> This is ridiculous! The DHSS surveyor AND the State Board of Pharmacy knows the hospital and the practice of Pharmacy and aspects around what has to be done in a hospital pharmacy. I will forward the request to the gentleman at DHSS…

and

> I spoke again with Richard Grindstaff, and he says we are really getting down in the weeds, as he considers it one in the same, but will contact his counsel to see if he can write it that specific.

Subsequently, on August 19, 2020, Nicholson emailed Grindstaff again, stating:

> Richard, I truly hate to bother you, but I am attaching a question from the pharmacist's lawyer again. Would you read this and be able to send the reference about what section the hospital would be cited on with a dog in the general pharmacy that houses the sterile compounding activities, as well as non-sterile compounding.

Grindstaff responded to Nicholson's email with the following:

> Brad, I have talked with my leadership about this situation. As I informed you before, we do not get involved with staff/hospital disputes. In this particular situation there is no specific regulation on service dogs in hospital pharmacies. Although, this does raise concerns with infection control and sterile processing that is being performed within your pharmacy. If a service animal is allowed within your pharmacy, then it is up to the hospital to decide what precautions are needed to protect the safety of the participants within your pharmacy. We would look at each case individually and see what precautions you have put in place to assure that

the service animal does not affect Infection Control within the pharmacy, and did the hospital staff follow the precautions.

On August 20, 2020, Nicholson emailed Irwin, Unkel and Fracica, forwarding the August 19th email from Grindstaff and stating:

> See below. As specified, no one will make a determination, however, we will always be under risk for infection control. The Board of Pharmacy said that would not allow it, however, they refer to legal counsel. We need to discuss this together as I feel strongly it is not the right thing to do for the safety of our patients, and meet the intent of the regulations. Need to discuss some other items with this.

On August 20, 2020, Nicholson emailed Grindstaff again, stating: "Thank you. At this point, if we are surveyed, from what I am reading, it would be up to us to prove that the service animal does not constitute an infection control risk." Grindstaff responded stating simply: "That is correct." If either Grindstaff or Glenski had told Nicholson that there was no risk of contamination by having an animal in the pharmacy, Nicholson would have reconsidered his report and advised Bothwell to grant Plaintiff's request.

On August 20, 2020, Nicholson submitted an inquiry through the American Society of Healthcare Pharmacists' ("ASHP") website regarding the issue and on or about August 21, 2020, Nicholson spoke on the phone with Paul Bush of the ASHP. When speaking with Bush, Nicholson informed Bush that "the Board of Pharmacy would not allow a[n] animal in the pharmacy, and the DHSS said they would cite us for infection control issues." According to Nicholson, Bush provided the following feedback during the initial conversation regarding Plaintiff's counsel's position:

> He went on to say that didn't they understand that the implication was to allow individuals to come into retail pharmacies with their service animals to pick up their prescriptions, even though it was expressly written that way. From a peer perspective, he could not understand this type of request for a service animal accommodation in the hospital environment, especially with the new types monitoring that are available.

11

While Nicholson continued to gather information, Defendant maintained its regular communications with Plaintiff through her attorney. Defendant sent Plaintiff a list of job openings at Bothwell and asked Plaintiff to apply for any job that fit her qualifications. Bothwell, through an August 13, 2020 letter, also discussed an accommodation that would have allowed Plaintiff to continue working in the pharmacy by utilizing a continuous glucose monitor. Johnson had told Bothwell that Plaintiff's previous use of a continuous glucose monitor had been unreliable. Bothwell asked if Plaintiff had considered using a different continuous glucose monitor model and for further information about the time frame she tried using the other model. Johnson never addressed Bothwell's questions about the continuous glucose monitor in her responsive letter.

In addition to the accommodation suggestion of using a continuous glucose monitor, Defendant offered Plaintiff a new position that had just been created: the Covid Resource Coordinator. Bothwell offered her this position before it was open to the public, and the job description listed a pharmacy degree as its educational requirement for the position. The position was offered to Plaintiff at the same rate of pay, and while temporary, Bothwell believed that it was likely to last for the six months Plaintiff needed to train her dog and would give the parties time to consider additional reasonable accommodations, if necessary. After questioning by Johnson, Bothwell informed Plaintiff that the Covid Resource Coordinator position would include exposure tracking, potentially testing employees for Covid, and (once one would be available) giving vaccines to employees and potentially patients. There would be a possibility of coming into contact with a Covid positive patient, as would any of the other open positions in the system. Bothwell also stated that the "position will mirror Ms. Howard's current pharmacy position and will be a full time hourly position."

12

Case 2:21-cv-04034-MDH   Document 77   Filed 04/21/22   Page 12 of 19

Plaintiff turned down the Covid Resource Coordinator position, with no explanation as to why at the time. Plaintiff later explained that she turned this position down because she felt it was putting someone immunocompromised on the front lines of the Covid-19 pandemic. However, after leaving Bothwell, Plaintiff applied for a position with CVS for Covid Vaccine Support. When asked how this differed from the Covid Resource Coordinator position, Plaintiff stated that:

> It differed in that from the – it was the research coordinator, the description made me believe that I was definitely going to run into individuals that have Covid or any other type of infectious disease that I'd be in contact with, and that this is administering vaccines to otherwise healthy individuals, otherwise they shouldn't be receiving the vaccine.

Plaintiff never applied for any of the other positions Bothwell offered her.

Prior to Plaintiff's request for accommodation, the Defendant was in the process of opening a retail pharmacy for employees (the "employee pharmacy"). The employee pharmacy is connected to the primary hospital pharmacy by a locked door. In correspondence dated August 11, 2020, Plaintiff – through counsel – proposed an accommodation to allow her to work in the employee pharmacy, with a leave of absence until that pharmacy opened. While Nicholson had spoken informally with another pharmacist, Jessica Moon, about working in the employee pharmacy prior to Plaintiff's request for accommodation, the employee pharmacy pharmacist role was not a new position and Moon remained a pharmacist with the same job title as Plaintiff even after she moved to the employee pharmacy. Moon commenced employment with Bothwell about one year prior to Plaintiff. In 2020, there were no job requisition forms to replace Jessica Moon in anticipation of moving her to the employee pharmacy. There were no job requisition forms for a pharmacist for the employee pharmacy in 2020. The pharmacist in the employee pharmacy has the same job description as the pharmacists that work in the hospital pharmacy, with the same qualification requirements.

On August 19, 2020, Nicholson completed and filed a job requisition form seeking a replacement for Plaintiff, noting: "Unable due to regulations to accommodate service animal in pharmacy." On or before August 31, 2020, Nicholson started reviewing resumes to fill the pharmacist position. On September 14, 2020, Nicholson submitted a job requisition form to replace pharmacists Tyler Cramer. On or before September 18, 2020, Plaintiff identified a job posting online that appeared to be a posting for her pharmacist position and inquired on the issue through counsel.

During the discussions between Plaintiff and Defendant, Plaintiff – through counsel – proposed mitigating measures as early as a letter dated August 21, 2020 that she proposed could be adopted to reduce any risk posed by the proposed accommodation, including installation of a portable air scrubber in the area outside of the "clean room," the use of a crate to house her service dog when Plaintiff is required to enter the sterile compounding suite or perform non-sterile compounding, brushing the animal regularly, up to three times a week; patting down the dog to remove loose hair before each shift; having the service animal wear booties or using a hose prior to each shift to clean the service animal's paws before entering the hospital; prohibiting other personnel from touching the service animal; washing her hands after touching the service animal; and increased sanitization testing in the "clean room" to screen for issues. On September 8, 2020, Defendant, through counsel, represented that it had considered the mitigation options proposed by Plaintiff, but that the team had concluded that those measures would not "eliminate the risk associated with a potential safety issue."

On or about September 9, 2020, counsel for Bothwell sent Johnson a letter detailing the information received from Grindstaff and Glenski, offering again to provide reassignment, and asking for Johnson to identify the experts she mentioned in her prior correspondence. Bothwell

14

Case 2:21-cv-04034-MDH   Document 77   Filed 04/21/22   Page 14 of 19

contends it continued to work with ASHP to set up a walkthrough and investigation. However, Plaintiff cites to a response "do not proceed… yet" because Defendant didn't know if they needed it at that time. Further, Plaintiff contends this proposed third party analysis was not communicated to her.

On or about September 18, 2020, Johnson sent Bothwell a letter stating that Plaintiff planned to resign and stating, among other things, that Bothwell had posted Plaintiff's position as a job opening. Defendant responded that it was working on a response to her letter of September 18, 2020. While Defendant was working on a response, Plaintiff sent her letter of resignation (dated September 18, 2020) to Nicholson on September 23, 2020.

Throughout the entire interactive process—from the time Plaintiff left work to train her service animal until the day of her resignation—Defendant had provided continuous paid leave to Plaintiff. Further, neither Plaintiff's pay nor benefits were cut during the time the parties engaged in the interactive dialogue. Despite receiving the resignation letter, Wente emailed Johnson to ask Plaintiff to reconsider. Defendant said that it was still willing to work to find an accommodation for Plaintiff, and it formally offered its plan to have a mutually-agreed upon third party (ASHP) inspect the pharmacy premises and make a determination about whether or not Plaintiff's service animal would pose a contamination risk. Plaintiff refused Defendant's offer and said that Defendant had "ample opportunity" to investigate her accommodation request.

Plaintiff states she decided to resign because: "despite my previous opinion that things were being done in good faith, after talking with counsel and the back and forth that was going on, I had decided to resign." Plaintiff states nothing had changed about her work environment after she made her request for accommodation and that she would not have accepted any accommodation other than Defendant allowing her service dog into the pharmacy.

15

On September 21, 2020, Defendant represented to Plaintiff that "Bothwell is not currently looking to fill Ms. Howard's position." On September 22, 2020, Nicholson sent Irwin two emails regarding the job posting for the pharmacist, stating: "You can respond if you like that the pharmacist position posting was for another pharmacist position that was going to be vacant" and "I have two pharmacist interviews this week. One is to replace Tyler, and one is to replace Jessica when she goes over to the employee rx. Nothing for Samantha at this point."

Plaintiff states she currently works PRN in an inpatient pharmacy in Belton, Missouri. The Belton pharmacy has a sterile compounding suite with an ante room, line of demarcation and clean room similar to Defendant's inpatient pharmacy. Plaintiff is permitted to bring her service animal to work with her at the Belton inpatient hospital pharmacy.

## **STANDARD OF REVIEW**

Summary judgment is proper if, viewing the record in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp., v. Catrett,* 477 U.S. 317, 322-23 (1986). The moving party is entitled to summary judgment as a matter of law if they can establish there is "no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Once the moving party has established a properly supported motion for summary judgment, the non-moving party cannot rest on allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 248.

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the factual dispute that would require a jury to resolve the differing versions of truth at trial. *Id.* at 248-249.

Further, determinations of credibility and the weight to give evidence are the functions of the jury, not the judge. *Wierman v. Casey's General Stores, et al.,* 638 F.3d 984, 993 (8th Cir. 2011).

## DISCUSSION

To prevail on a failure to accommodate claim a plaintiff must prove both a prima facie case of discrimination based on a disability and a failure to accommodate the disability. *Evans v. Cooperative Response Ctr., Inc*., 996 F.3d 539, 547 (8th Cir. 2021), citing *Moses v. Dassault Falcon Jet-Wilmington Corp*., 894 F.3d 911, 923 (8th Cir. 2018). To establish a prima facie case of disability discrimination based upon a failure to accommodate, a plaintiff must prove these elements: (1) the employer was aware of the disability; (2) the employee requested an accommodation for the disability; (3) the employer failed to make a good faith effort to assist the employee's request for accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002).

Here, Defendant's motion for summary judgment does not dispute Plaintiff was disabled or that she was qualified to do her job with or without reasonable accommodation. Pursuant to the ADA, when the Defendant is made aware of Plaintiff's legitimate need for an accommodation, it must make a reasonable effort to determine an appropriate accommodation. *Knutson v. Schwan's Home Serv., Inc*., 711 F.3d 911, 915 (8th Cir. 2013). "In a reasonable accommodation case, the "discrimination" is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations. *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004). At summary judgment, the plaintiff must show that the requested accommodation is reasonable on its face and if that is shown the Defendant must demonstrate undue hardship in that circumstance. *Id.* at 768. Further, whether an accommodation is reasonable

17

under the ADA can be a question of fact for the jury. See *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 796 (8th Cir. 2007).

Here, the Court has reviewed the record before it and finds there are material questions of fact with regard to Plaintiff's request for the accommodation of a service animal and Defendant's response to the same. Plaintiff has provided enough evidence to submit her claim to a jury regarding whether Defendant engaged in a good faith effort to assist Plaintiff in seeking an accommodation. The Court finds there are questions of fact regarding the entire interactive process between Plaintiff and Defendant, including both parties' participation in the discussions of Plaintiff's request to bring a service dog into the pharmacy. A jury will need to resolve these factual disputes based on the evidence presented.

The factual disputes that exist include, but are not limited to, whether Plaintiff's decision to submit her resignation terminated the interactive process with her employer and whether her responses to Defendant's alternative accommodations allowed Defendant to pursue an interactive process. There is also a question regarding the amount of time Plaintiff would require the service dog to be with her at work both during the training period and after. In addition, there are questions of fact regarding Defendant's evaluation and investigation of Plaintiff's request and its communications with Plaintiff regarding the same. For example, Defendant suggests that Plaintiff refused Defendant's offer to allow a third party (ASHP) to inspect the pharmacy and issue a determination regarding her request for the accommodation. However, a review of the evidence reflects that the timing and communication of Defendant's "offer" is not as clear as argued and presented by Defendant in the briefing.

The Court finds there are other factual issues that may be presented to the jury that are not specifically referenced herein. As a result of the factual disputes that exist regarding the

18

communications between Plaintiff and Defendant with regard to her specific request for an accommodation, the Court finds summary judgment is not warranted.

## CONCLUSION

Wherefore, for the reasons set forth herein, the Court denies Defendant's motion for summary judgment. (Doc. 59).

**IT IS SO ORDERED.**

DATED: April 21, 2022

                                            */s/ Douglas Harpool*
                                          **DOUGLAS HARPOOL**
                                          **UNITED STATES DISTRICT JUDGE**